DENNIS C. HARRINGTON AND TRESE M. HARRINGTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Harrington v. Commissioner
Docket No. 13993-82.
United States Tax Court
T.C. Memo 1984-428; 1984 Tax Ct. Memo LEXIS 247; 48 T.C.M. (CCH) 837; T.C.M. (RIA) 84428; August 9, 1984. Dennis C. Harrington, pro se and Robert T. Schwer, for the petitioners. Michael A. Yost, Jr. and Frank A. Falvo, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: Respondent determined the following deficiencies against petitioners for their tax years 1972, 1975, 1976, 1978, 1979 and 1980: Tax year ended
Deficiency
December 31, 1972
$6,834.00
December 31, 1975
14,140.22
December 31, 1976
14,671.94
December 31, 1978
25,592.88
December 31, 1979
13,195.32
December 31, 1980
1,619.64
*250 After concessions, the following issues remain for decision herein: (1) Whether respondent's proposed assessments for petitioners' tax years 1972, 1975 and 1976 are barred by the statute of limitations; (2) whether petitioner, as a limited partner of Shhh Associates, Ltd., which owned a movie as its principal asset, is entitled to his distributive share of the claimed losses and investment credits from the partnership; and (3) whether petitioner is entitled to claim an investment credit and deductions for depreciation and other expenses relative to his acquisition and exploitation of certain rights in a lithographic plate. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation and the exhibits attached thereto are incorporated herein by this reference. Dennis C. Harrington (hereinafter referred to as "petitioner") and his wife, Trese M. Harrington (hereinafter referred to, together with petitioner, as "petitioners") were residents of Pittsburgh, Pennsylvania at the time they filed their petition herein. For each of the tax years in issue, petitioners timely filed joint Federal income tax returns with the Internal Revenue Service *251 Center in Philadelphia, Pennsylvania. In 1975, petitioner, who graduated in 1951 from the University of Pittsburgh Law School, was a partner in the law firm Harrington & Schweers. Petitioner is an attorney, who has practiced solely in the area of personal injury litigation. Issue 1. Statute of limitations
Petitioners filed their Federal income tax returns for their tax years 1972, 1975 and 1976 on or before April 15, 1973, April 15, 1976 and April 15, 1977, respectively. In October 1978, both petitioners executed a Form 872, "Consent to Extend the Time to Assess Tax," purporting to extend until December 31, 1979 the period of limitations applicable to petitioners' tax year 1975. Said form was received by respondent's Audit Division in Pittsburg on October 12, 1978, and was executed by respondent's authorized representative on October 16, 1978. In October 1979, both petitioners executed a Form 872A, "Special Consent to Extend the Time to Assess Tax," purporting to extend to an indefinite date [1] the period of limitations applicable to petitioners' tax years 1975 and 1976. Said form was received by respondent's Audit Division on October 15, 1979, and was executed by *252 respondent's authorized representative on October 23, 1979. On March 24, 1982, the statutory notice of deficiency for their tax years 1972, 1975, 1976, 1978, 1979 and 1980, was sent to petitioners by certified mail. Issue 2. Shhh Associates, Ltd.
Beginning in September 1975 and up to at least the time of the trial in this matter, petitioner was a limited partner in Shhh Associates, Ltd., a limited partnership, of which Frank Carcaise and later Robert Solkovy were the general partners. Pursuant to a Confidential Descriptive *253 Memorandum (hereinafter referred to, relative to Issue 2, as "Memorandum"), dated August 12, 1975, which was received by petitioner prior to his investment in Shhh Associates, Ltd., the business of the partnership, which was formed pursuant to the laws of the State of Florida, was described as "[t]he acquisition and distribution of a motion picture." Specifically, as further stated in the Memorandum, the partnership was formed to acquire the theatricial, non-theatrical, public television, cable television and cassette rights to a film entitled "Shhh" (hereinafter referred to as "the film"), which was described, in pertinent part, as follows: The full length Motion Picture will be entitled "Shhh" and will consist of seven (7) movie shorts that will relate to one another plus a new segment to be specially produced that will "bridge" the selected shorts, creating a cohesive story line. The shorts are: Title
Length
Awards
1. Skater Dater
18 minutes
Oscar Nominee 1964
Winner: Cannes,
Edinboro [sic]
Festivals
CINE Winner 1964
2. Blaze Glory
10 minutes
CINE Winner 1965
3. Frank Film
9 minutes
Academy Award 1974
CINE Winner 1974
Winner: Cannes Festival
4. Crunch, Crunch
8 minutes
Academy Award 1971
5. One Armed Bandit
10 minutes
No Theatrical Release
6. Canoe Trip
17 minutes
No Theatrical Release
7. Solo
15 minutes
Oscar Nominee 1972
CINE Winner 1972
National Ed. Fest.
Winner 1973
*254 As noted in the Memorandum, the producer and seller of the film was Maurice W. Gable of Pittsburgh, Pennsylvania, and the director was Paul B. Price. Prior to his involvement in "Shhh," Mauric Gable had nver been involved in the production or distribution of a full length feature film. During the late 1960's Gable first became involved in the film business, marketing a film for Trans World Airlines, and producing short films in association with Ezra Baker, at least some of which were produced for distribution by United Artists Corp. (hereinafter referred to as "UA"). From November 1969 until January 1971, Gable was involved with Gable Simulated Systems, Inc., which owned a franchise from a division of The Singer Company to conduct driving education courses in the Pittsburgh area using automobile simulators. In or around 1971, Gable established Gable Enterprises, Inc., originally for the purpose of marketing the foregoing driving school. In 1973, through Gable Enterprises, Inc., Gable produced a documentary film entitled "My Father's Business" for the Catholic Diocese of Pittsburgh, receiving $44,000 therefor. After his involvement in the production of "Shhh," Gable wrote, cast *255 and produced, through Mary Tyler Moore Productions, a television movie entitled "Fighting Back," which aired on the ABC television network. Paul B. Price, proposed director of the film, was described in the Memorandum as having a background in theater, television and movies. As to movie experience, the Memorandum stated only that Price wrote, directed, and acted in a short film entitled "1501 1/2" (which was eventually included in the film) and that he remained active writing for movies. The Memorandum also addressed the distribution and marketing of the film, stating that an "agreement in principle" had been reached with UA, as follows: Pursuant to the completion of the Picture on or before August 31, 1975, it is the present intention of [UA] * * *, the proposed distributor, to test the Picture and its specially created advertising/promotion campaign in mini metro markets such as Harrisburg, Pennsylvania, Princeton, New Jersey, etc. Pursuant to the purported agreement in principle, at the end of the testing period, UA would "have the right to acquire world-wide distribution rights and all merchandising and music rights to the Picture." If UA elected to exercise such *256 right, the Memorandum provided, it would "enter into its standard distribution agreement for the Picture * * *." If UA elected not to distribute the film, the Memorandum indicated, the partnership would have the right to distribute it upon payment to UA of $92,000. Referenced in and appended to the Memorandum were two appraisals of the film, prepared on behalf of the general partner, Frank R. Carcaise. The first appraisal, signed by Ezre Baker of Ezra Baker Productions, Inc., was a two-page document, concluding based upon the author's familiarity with UA and its "[excellent] reputation as a leader in the film industry" that "the Partnership can anticipate as their share $5,000,000 net of distribution fees and expenses * * *," in addition to certain non-theatrical revenues. Baker's analysis of the intrinsic merits of the film is limited to the following: Regarding "Shhh," I found it to be highly professional production. The picture will probably get a "G" rating and should do extremely well at the box office especially since quality "family" comedies are so rarely launched by a major distributor. This appraisal was dated August 6, 1975, which was approximately one month *257 before production of the film was completed. The appraiser, Ezra Baker, was involved with Gable on the film in the early stages of production of the film and was also associated with Gable on a number of short film projects at various times during the 1970's. Other than such preliminary involvement with the production of "Shhh," Baker had no experience in the production of feature length films, and he had no experience at all in the distribution and marketing of such films. The second appraisal, signed by Carl Workman, president of Calliope Films, Inc. was a two page document, concluding based upon the "excellent reputation and ability" of UA, and "the packaging of the film, its quality, the previous record of some of its component parts, the strength of the distributor, and present market conditions * * *," that "the distributor's proceeds could be in the area of $8,800,000.00 or more and the partnership may anticipate one half as their share over the life of the contract," in addition to certain non-theatrical revenues. Workman's analysis of the intrinsic merits of the film is limited to the following: Regarding the film itself, the acting, direction, story and production *258 values are excellent. A family comedy distributed and promoted by [UA] should certainly bring out good audiences at this time, and in the future. This appraisal was dated August 10, 1975, which was approximately one month before production of the film was completed. As discussed infra,Calliope Films, Inc., of which Carl Workman was president, was employed by Mauric Gable in June 1975 to perform production services for the film. While Calliope Films, Inc. did some such production work for feature films, however, the company was primarily involved in producing advertising, known in the industry as "trailers," for such film distributors as UA. As president of Calliope Films, Inc., Workman was not involved with the distribution or marketing of films. Pursuant to the Memorandum, the investment described therein was "available only to those individual investors whose net worth (exclusive of home, furnishings and automobiles) is at least $200,000 and some portion of whose annual gross income would be subject to Federal income tax at a rate of 50% or higher or investors taxed as corporations." This restriction was reiterated in a pre-offer statement, dated September 16, 1975, which *259 was provided to petitioner as part of the private placement of Shhh Associates, Ltd. Prospective investors were cautioned in the Memorandum that "[t]his investment involves a high degree of risk * * * and, consequently, the purchase of units should be considered only by persons who can afford a total loss of their investment." Included among the risk factors then described were the highly competitive and subjective nature of the motion picture industry, and the possibility of a challenge by the Internal Revenue Service to certain factors used by the partnership in computing depreciation, including "estimated receipts anticipated for the Picture" and "the equivalence of the fair market value of the Picture to its purchase price." As to the possible box office receipts to be derived from distribution of the film, the Memorandum notes as follows: Since the film has not be [sic] released anywhere there have been no gross box office receipts derived from exploitation of the Picture. In addition, since as a general rule gross box office receipts are attributable to the feature films and not a short subject, gross box office receipts as to the five previously released shorts included *260 in the Picture are not available. Included in the Memorandum, which consisted of some 47 pages, exclusive of exhibits, was a fifteen page section devoted exclusively to "Tax Factors." In addition, appended to the Memorandum as an exhibit was an eighteen page legal opinion prepared by Samuel L. LePrell of the law firm Rogers, Towers, Bailey, Jones & Gay in Jacksonville, Florida, setting forth the Federal income tax consequences of the proposed venture. In such tax-oriented sections of the Memorandum, it was provided that the film would be depreciated under the income forecast method. Pursuant to the offering set forth in the Memorandum, the motion picture would cost the partnership $2,300,500, to be paid as follows: (1) $154,000 at the closing; (2) $146,500 on January 31, 1976; and (3) $2,000,000 through issuance by the partnership of a long-term, nonrecourse purchase money note in such principal amount, secured solely by a first lien security interest in the film. The note, which was to accrue interest at an annual rate of 8 1/2 percent, was to be paid out of 70 percent of the "net theatrical and non-theatrical proceeds" (defined as gross film rentals less than fees and expenses *261 of distribution), plus 70 percent of the net television proceeds derived from exploitation of the film, with the net proceeds remaining after payment of the note to be distributed among the partners in accordance with their interests in profits and losses. In the event that all partnership units were sold, the offering provided for an expected partnership capitalization of $402,500, consisting of $2,500 of general partnership interests and $400,000 of limited partnership interests, including twenty-five limited partnership interests to be offered at $16,000 per unit. Potential investors in Shhh Associates, Ltd. were also furnished with financial projections computed by the accounting firm, G. L. Roteman & Associates, dated August 13, 1975. The accounting firm projected the financial consequences to the partnership and to the limited partners under the assumptions, inter alia, that distribution of the film would produce, in the alternative, either no proceeds or sufficient proceeds to allow the partnership to pay off its $2,000,000 note. The projections are prefaced by the following admonition: The * * * projections are not intended as a presentation of predicted future results *262 of operations. In light of the uncertainty of public acceptance of any given motion picture, it is highly unlikely that either level of exhibition proceeds set forth in the projections will be achieved during the periods indicated. According to the projections, distribution of the film would generate the following cumulative excess of tax savings over investment per partnership unit, under the foregoing alternative assumptions: Table 1. Financial projections
Cumulative excess
Sufficient proceeds
Year
No proceeds
to pay note
1975
$15,324
$6,663
1976
23,726
7,323
1977
24,865
8,463
1978
26,004
9,564
1979
27,143
10,622
1980
28,282
11,633
1981
29,421
12,593
1982
30,560
13,498
1983
31,699
14,343
1984
32,838
15,122
1985
33,977
15,832
1986
35,116
16,466
1987
391
19,353
The projections by G. L. Roteman and Associates are explicitly based upon the assumed use by the partnership of the income forecast method of depreciation for the film. Applying this method at the approximate rate of 35 percent for both 1975 and 1976, it was projected that depreciation would be in the amount of $804,692 in each such year under *263 either of the foregoing alternative assumptions. For the assumption that the film would produce sufficient proceeds to allow repayment of the note, the projection of an approximate depreciation rate of 35 percent, which is applied to the partnership's adjusted basis in the film under the income forecast method, was apparently derived by dividing assumed annual exhibition proceeds in the amount in each such year of $1,250,000 by assumed lifetime exhibition proceeds in the amount of $3,394,601. Petitioner first became aware of the possibility of investing in Shhh Associates, Ltd. through his accountant, Robert T. Schwer, with whom petitioner discussed tax matters on a regular and frequent basis, including the potential of the instant investment as a tax shelter. Prior to this investment, neither petitioner had purchased or otherwise invested in movies or movie rights, nor had any expertise in the movie business. In accordance with the offering described in the Memorandum, at an undisclosed date in September 1975, petitioner purchased a unit in Shhh Associates, Ltd., for $16,000, representing a 3.8 percent limited partnership interest. Shhh Associates, Ltd. consisted of nineteen *264 limited partner and one general partner, Frank R. Carcaise, who was a resident of Boca Raton, Florida at the time the partnership was formed. As noted in the Memorandum, Carcaise, who contributed $2,500 to the capital of the partnership, had no experience in the movie industry. Gable began production of the film in May 1975 and completed it in September 1975. When completed, the film consisted of one "bridging" sequence and seven movie shorts, including "Skater Dater," "Blaze Glory," "Crunch Crunch," "One Armed Bandit," "Canoe Trip," and "Solo," as described in the Memorandum, together with "1501 1/2", which was substituted for the short described in the Memorandum as "Frank Film." It was intended that the film would receive a rating of either "G" or "PG" from the Motion Picture Association of America. Maurice Gable did not own the short films which comprised the film, with the possible exceptions of "Canoe Trip" and "1501 1/2." Rather, Gable held licenses to use such shorts as part of the film. In particular, four of the shorts which were used in the film were licensed by UA to Maurice Gable to be used in the film on a non-exclusive basis. At its sole expense, and at no cost *265 to Gable, UA provided Gable with a 35 mm print of each of the following shorts: "Skater Dater," "Blaze Glory," "Crunch Crunch," and "Solo." Gable purchased the rights to "One Armed Bandit" for $2,000. The rights to "1501 1/2" were acquired by Gable at no cost through his association with Paul B. Price, who wrote and directed the short. The final short, "Canoe Trip," which was produced by Gable for use in the film, featured Rita Moreno and was written and directed by Paul B. Price. The "bridging" sequence featured Rita Moreno and Robert Sacchi. Rita Moreno, who has performed in many movies, received the Toney award for best actress for her performance in "The Ritz," and an Academy Award for her performance in "West Side Story." Robert Sacchi is known as a look-alike and impersonator of the late Humphrey Bogart. In the "bridging" sequence, which was written and directed by Paul B. Price, and produced by Maurice Gable, Moreno and Sacchi portrayed a couple on a blind date meeting at a movie consisting of the foregoing seven short films. The shorts comprising the film were selected by Gable following a process of live audience testing. UA provided Gable with access to its screening *266 room facilities as well as its library of short films, and Gable conducted the testing process, as follows: And they gave me the executive screening room for this * * *. And bring in a different series of audiences, and test the shorts * * *. Select the ones that you like. We had a questionnaire. * * *.We tested with college audiences, high school audiences. At some points * * * we gave out things in the street, and invited people to come up during certain hours * * *. [W]e really had as many different mixes as possible. We had started out favoring about five [of the shorts] * * * and three of them stood out through the series of tests. During the testing process, which lasted over one month, the tested films were shown to approximately twelve different audiences. In June 1975, Gable employed the services of Calliope Films, Inc. to do the production and post-production work for the film. Carl Workman was the president of Calliope Films, Inc.
Total production costs for the film were in the approximate amount of $200,000. During 1975, Gable incurred 100 percent and paid some 90 percent of such costs. By the terms of an acquisition agreement, dated and signed *267 on September 12, 1975, Shhh Associates, Ltd. acquired from Maurice Gable, subject to an agreement with UA, hereinafter described, all of his rights, title and interest in and to the film for the territory encompassing "the United States of America, and the District of Columbia, Puerto Rico, the Virgin Islands, all United States possessions, territories, and trusteeships, * * * all ships flying the flag of the United States of America, and all United States military installations, Red Cross and Veteran's Administration and missile stations wherever situated throughout the world." The acquisition agreement recites that the aggregate production costs for the film were not less than $310,000. As consideration for the rights received from Gable, the partnership agreed to pay him the sum of $2,300,500, to be payable pursuant to terms substantially identical to those set forth in the Memorandum. On September 17, 1975, Shhh Associates, Ltd., through its general partne, Carcaise, executed a non-negotiable, nonrecourse note, subject to the terms of the acquisition agreement, promising to pay Mauric Gable the principal sum of $2,000,000 plus interest at the rate of 8 1/2 percent per annum, *268 payable out of 70 percent of the net proceeds derived by the partnership from theatrical and non-theatrical exploitation of the film. Pursuant to a security agreement executed on the same date, the note was secured solely by the interest acquired by the partnership in the film under the acquisition agreement.The note was due on or before August 31, 1987. As of the time of the trial in this matter, Shhh Associates, Ltd. had not made any payments toward the interest or principal on the foregoing nonrecourse note. Under the acquisition agreement, the partnership agreed to pay Gable the sum of $300,500, payable $154,000 on or before September 15, 1975 and $146,500 on or before January 21, 1976. Payments actually made by or on behalf of Shhh Associates, Ltd. to Gable under such agreement, totaled $217,500, as follows: Table 2. Payments made under acquisition agreement
Date of payment
Amount
September 12, 1975
$108,000
September 12, 1975
11,000
October 5, 1975
56,000
January 30, 1976
42,500
Total
$217,500
There is no indication that Gable ever sought to collect the remaining $83,000 from the partnership. The distribution of the film was *269 addressed in the acquisition agreement, as follows: Seller has entered into a preliminary agreement with [UA] for the distribution of the Film. As a secured creditor pursuant to the Security Agreement the Seller will use his best efforts to negotiate a national distribution agreement with [UA] as agent for the Purchaser and will assign all of his right, title and interest in such national distribution agreement to the Purchaser * * *. [Emphasis added.] At all times here pertinent, UA was one of the largest distributors of motion pictures in the world, with offices in every major American and Canadian city. UA, as a financial and distribution company, did not produce motion pictures, but rather received them from independent producers. The "preliminary agreement" referred to in the acquisition agreement was embodied in a letter dated May 13, 1975, directed to Gable from Dean Stolber on behalf of UA, and signed by both parties. This letter agreement was negotiated for UA by Arthur Reiman, who was at that time a manager of UA's road show department, responsible as such for coordinating the booking of and monitoring the gross receipts from variuous films in distribution. *270 At that time, responsibility for the distribution of UA's films lay with Reiman's supervisor, James R. Velde, who was UA's vice president and general sales manager. At an undisclosed time just prior to UA's entry into the foregoing agreement, another major film distributor and competitor of UA, Warner Brothers, had released a feature-length movie of "Bugs Bunny" cartoons, connected by a "bridging" sequence, which resulted in gross proceeds in excess of $3,000,000. In light of the success of this cartoon anthology film, and his belief that the short films selected for inclusion in "Shhh" were of excellent quality and appeal, Reiman believed that the film would be popular and successful. Under the terms of the letter agreement negotiated by Gable and Reiman, the former undertook the initial responsibility to distribute the film. Such agreement provided, in pertinent part, as follows: This will confirm our agreement for the production and possible distribution of the above titled film: 1. The film will be produced by you [2] and directed by Ezra Baker, utilizing 4 shorts from UA's library and 4 of your own shorts, together with approximately 30 minutes of additional bridging *271 material to make the completed film. You will be solely responsible for the entire cost of producing the film, as well as for all advertising and print costs required to be advanced during the testing of the film, as set forth below. You will be engaging a national figure, to be approved by UA, who will appear in the film as its narrator. * * * 5. After delivery of the completed film to UA, the film will be tested for up to 3 months in one or more markets to determine what, if any, theatrical potential exists for the film. UA and you will jointly determine the manner and extent of such testing, and the amount of money to be expended in this connection. It is specifically understood and agreed that you and Ezra Baker, will personally, and at your own expense, visit each test market to supervise the details of the campaigns in these test markets. All costs expended during said test period, including prints and advertising, shall be advanced solely by you, and all gross receipts derived from such tests will be divided 50% thereof to UA and 50% thereof to you, after you have recouped your print and advertising costs.
6.At the end of the 3 month testing period, UA will *272 have the right to acquire worldwide distribution rights in the film in all languages, gauges and media in perpetuity, at no cost to UA for such rights. If UA elects to acquire said distribution rights, UA will advance all normal and customary distribution expenses and will distribute the film on its current standard terms and conditions, including UA's usual distribution fee structure. * * * 7. After deduction from the gross receipts of UA's distribution fees and expenses, the remaining gross receipts shall be deemed "net receipts" and shall be divided 25% thereof to UA and 75% thereof to you. It is understood and agreed that any unrecouped costs incurred by you during the test period, as well as the entire cost of producing the film, will be recoupable by you solely out of your 75% of the net receipts from the film. * * * 9. In the event UA elects not to acquire worldwide distribution rights in the film, then your license to utilize the UA shorts will terminate, and you will have no further rights whatsoever with respect to the UA shorts. * * *. [Emphasis added.] As noted above, the letter contract called *273 for a three-month test marketing "to determine what, if any, theatrical potential exists for the film." Not all movies are test marketed prior to their release. Generally, those films are test marketed in which the producer and distributor have uncertain expectations concerning the potential success of such films at the box office. In view of the significant expense associated with theatrical release of a film, if a test marketing is unsuccessful, a reputable distributor will generally not distribute the film further. Pursuant to his agreement to undertake the initial test market distribution of the film, Gable employed the services of Hawkins, McCain and Blumenthal, Inc., and advertising agency located in New York City. Through Hawkins, McCain and Blumenthal, Inc., in turn, Gable employed at least four companies located in New York City to prepare artwork and printing for the film.Television and radio commercials for the movies were scripted and produced through the services of three other New York companies, and buttons advertising the movie were produced. Also included in the advertising campaign were theater interviews and telephone awareness checks concerning the film, conducted *274 by Callahan Research Associates, a New York market research firm. During the test marketing of the film, a total of approximately $26,400 was spent on advertising, and the entirety of this expense was paid by Gable. [3]
*275 To a greater extent than was customary for the average film in which it was interested, UA assisted Gable in the test marketing of "Shhh." Thus, UA selected the test market cities and UA's Reiman personally handled theatrical bookings in such cities. In each city, Gable was met by UA field personnel, who assisted him in making appropriate media contacts, and in publicizing the film.Throughout this process, Reiman closely monitored the results of each test market showing. Beginning in October 1975, the film was test marketed in four different cities, as follows: Table 3. Test marketing of Shhh
Dates
City
Theater
Opening
Closing
October 10, 1975
October 17, 1975
Columbus, Ohio
University Flick
Theater
October 17, 1975
October 23, 1975
St. Louis, Missouri
Brentwood Theater
October 29, 1975
November 11, 1975
Pittsburgh,
Squirrel Hill
Pennsylvania
Theater
March 20, 1976
March 27, 1976
Omaha, Nebraska
Astro, Q Cinema Four
and Gemini Theaters
During its test marketing, the film received mixed reviews from movie critics from a number of newspapers in the test city areas. Several of such reviews were favorable. *276 The first three test market showings of the film in Columbus, St. Louis and Pittsburgh resulted in gross box office receipts in the total amount of $8,331.98. Of this total amount, only $3,509.14 [4] was received by UA as film rentals. Since Gable's advertising costs exceeded such film rental proceeds, pursuant to the May 13, 1975 letter agreement, in January 1976, Reiman directed that UA draw a check payable to Gable in the amount of such rental proceeds, to be mailed to him at his home address. Following the first three unsuccessful test market openings, Carcaise wrote to the limited partners, advising them of the unsatisfactory results and of the mixed reviews, and reporting on the continuing efforts of Gable and UA to successfully market the film. Prior to the fourth test market opening in Omaha, Nebraska, in an effort to promote interest in the film, Gable, believing that the title of the *277 film was detracting from its box office performance, reoriented the advertising campaign so as to deemphasize such title in favor of the phrase "Here Comes the Funnies." Despite this effort, however, gross receipts from all four test market showings of the film were substantially less than $26,400, the approximate amount of total advertising costs for such markets. This box office performance was described by UA's Reiman as a "disaster." At an undisclosed time during 1976, as a result of the performance of the film in its test market releases, pursuant to paragraph 9 of its May 13, 1975 letter agreement with Gable, UA elected not to exercise its option to acquire distribution rights in the film. By letter dated February 2, 1977, Gable advised Samuel L. LePrell, counsel for Shhh Associates, Ltd. that the film had been unsuccessful at the box office. In the letter, Gable recommended that the only way that the film would be made profitable was to edit it to an "R" rating and to play the film almost exclusively in college towns.To achieve this, according to Gable, Shhh Associates, Ltd. would be required to make an additional investment of approximately $25,000. By letter dated *278 February 15, 1977, LePrell advised the limited partners that Carcaise had "not maintained contact with the Producer of the movie, or myself, or otherwise taken any positive actions to exploit this movie," and recommended that the partnership elect a new general partner "who will actively fulfill his obligations." LePrell also advised the limited partners of Gable's suggestion to edit the film to an "R" rating and of his estimate that this would require an additional investment of $25,000. Since the partnership was unwilling to make this additional investment, however, the film was never edited in the suggested manner. By letter dated March 16, 1977, LePrell further advised the limited partners that Robert Solkovy had been elected to replace Carcaise as general partner of Shhh Associates, Ltd. In May 1972, Gable advised the partnership that he believed that the film had possibilities for television and cable television distribution. However, between the end of its initial test marketing in 1975-1976 and the time of the trial in this matter, the film was neither distributed nor shown theatrically or for any other purpose. The motion picture industry is a high risk business in *279 which, typically, eight out of ten films lose money. For its tax years 1975 through 1981, Shhh Associates, Ltd. filed partnership returns (Form 1065), prepared in 1975, 1976 and 1977 by G. L. Roteman & Associates, and in 1978, 1979, 1980 and 1981 by R. O. Solkovy & Associates. For each year in issue, the partnership return reflected that petitioner spent "0%" of his time on partnership business. For its tax years 1979 and 1980 Shhh Associates, Ltd. reported its income and expenses on the accrual method of accounting. For its tax years 1975, 1976 and 1978, the method of accounting utilized by Shhh Associates, Ltd. is not disclosed on this record. For its taxable years 1975, 1977, 1978, 1979, 1980 and 1981, Shhh Associates, Ltd. reported no income. For its taxable year 1976, Shhh Associates, Ltd. reported gross income in the amount of $6,616.On its partnership tax returns for the taxable years 1975 through 1981, Shhh Associates, Ltd. reported the following ordinary losses: Table 4. Reported partnership losses
Year
Amount of loss
1975
$820,203
1976
809,404
1977
8,058
1978
7,368
1979
8,045
1980
7,693
1981
7,693
The foregoing reported *280 losses were computed by the partnership on such returns as follows: Table 5. Computation of reported partnership losses
I. Income
1975
1976
1977
1978
1979
1980
1981
Gross receipts
$6,616
Total income
6,616
II. Expenses
Payment to partners
8,500
Taxes
30
Depreciation
804,692
805,405
1,427
1,427
1,427
1,427
1,427
Amortization
1,090
5,941
5,941
5,941
5,941
5,941
5,941
Legal fees
5,000
Other deductions
325
Accounting fees
250
680
665
325
Office expense
121
71
10
Premiere expense
800
Interest
4,323
Bank service charge
12
Total expenses
820,203
816,020
8,058
7,368
8,045
7,693
7,693
Ordinary loss
820,203
809,404
8,058
7,368
8,045
7,693
7,693
Several of the foregoing reported deductions are further explained on the partnership's return for the years involved, as follows: 1. Depreciation - (a) For its tax years 1975 and 1976, reporting that it was utilizing the income forecast method of depreciation, the partnership depreciated its alleged basis of $2,300,500 in the film, reporting $804,692 therefor in each such year. No computation *281 of such deduction was set forth. (b) For each of the years 1976 through 1981, inclusive, reporting that it was utilizing the straight line method of depreciation, the partnership depreciated its alleged basis of $14,270 in so-called "prints," amortized over a ten year period, for a deduction in 1976 in the amount of $713, and annual deductions thereafter in the amount of $1,427. No further explanation of this deduction was provided. 2. Amortization - (a) For its tax years 1975 through 1981, inclusive, the partnership amortized its alleged basis of $39,256 in "legal costs and commissions" over a 12 year period, for deductions in the amount of $1,090 in 1975, and $3,271 in each such year thereafter. (b) For its tax years 1976 through 1981, inclusive, the partnership amortized its alleged basis of $29,375 in additional alleged "legal costs and commissions" over an 11 year period, for additional deductions in the amount of $2,670 in each such year. In addition to the foregoing items of income and expense, for the year 1975, the partnership reported a total investment of $2,300,500 in new property as qualifying for the investment credit and allocable to its partners in accordance *282 with their percentage interests in the partnership. For the year 1976, the partnership reported an investment of $14,270 in new property as qualifying for the investment credit and allocable to its partners in accordance with their percentage interests in the partnership. The partnership determined that both such investment properties had useful lives of seven or more years. In accordance with petitioner's 3.8 percent interest in the partnership, Shhh Associates, Ltd. reported the following as his share of partnership loss and investment qualifying for the investment credit for the foregoing years: Table 6. Petitioner's share of partnership loss and investment credit
Investment
Year
Loss
Credit
1975
31,168
87,419
1976
30,757
542
1977
306
1978
280
1979
305
1980
292
1981
292
On their joint returns for each of the years 1975, 1976, 1978, 1979 and 1980, petitioners reported the share of partnership losses as described for those years in Table 6. On each such return, petitioner listed his occupation as "attorney" and no occupation was listed for his wife. Petitioners' Federal income tax return for 1975 reflects investments in new property *283 with a useful life in excess of seven years, as follows: Shhh Associates, Ltd.
$87,419
Harbor Vue TV Inc.
1,884
Unidentified
1,400
Total:
$90,703
For 1975, petitioners claimed a tentative qualified investment in new property in the above amount and a 10 percent tentative investment credit in the amount of $9,070. Pursuant to the limitations of section 46(a), [5] petitioners actually claimed an investment credit in 1975 in the amount of $1,661, leaving $7,409 unused in that year. On April 28, 1976, petitioners filed a Form 1045, Application for Tentative Refund, in order to carry back unused investment credit in the amount of $7,409 from 1975 to 1972. Such carryback was disallowed in the present notice of deficiency to the extent of $4,834, [6] constituting the sole matter here in issue relative to petitioners' tax year 1972. *284 In accordance with Table 6, petitioners' return for 1976 reflects an investment in new property with a useful life in excess of seven years by Shhh Associates, Ltd. in the amount of $542, and a claimed 10 percent investment credit relative to such property in the amount of $54. On March 24, 1982, respondent issued the present deficiency notice to petitioners, disallowing petitioners' share of losses attributable to Shhh Associates, Ltd. for 1975, 1976, 1978, 1979 and 1980, as shown on Table 6, for the following reasons: With respect to the above partnership, your claimed distributive share of losses is disallowed because you have not established the amount and character of such losses including but not limited to your failure to establish: (1) that the alleged events, transactions and expenditures ever occurred in fact or in substance, (2) that the venture was entered into for profit, or was in a trade or business, or was otherwise held for the production of income, (3) that the underlying events or transactions were entered into for profit, or arose in a trade or business, (4) the adjusted basis of assets allegedly subject to depreciation and amortization and the method *285 of depreciation and amortization, (5) that the claimed losses were not in excess of your adjusted basis, (6) that any nonrecourse financing should be considered in determining your adjusted basis in the partnership or in determining the adjusted basis of the partnership's assets, (7) with respect to deductions claimed, that all events have occurred which establish the fact of liability and the amounts thereof can be determined with reasonable accuracy. Respondent also disallowed petitioners' claimed investment credits which were attributable to the partnership, as follows: Tax Year Ended
Amount
December 31, 1975
$8,742.00
December 31, 1976
$ 54.00
You have not shown that you are entitled to a distributive share of investment credit in any amount from the partnership. A credit of $7,409.00 from 1975 not used that year was carried back to 1972. A previous examination report reduced the carryback by $575.00. Therefore the remaining credit of $6,834.00 for 1972 is disallowed. Issue 3. Westview Fine Arts, Ltd.
In the fall of 1978, petitioner was introduced by his accountant, Robert T. Schwer, to Kathy Beigel, who was the founder, president, and *286 sole shareholder and director of Westview Fine Arts, Ltd. (hereinafter referred to as "Westview"), concerning the possibility of investing in a lithographic plate entitled "The Men Cooperate." Such plate was to be created by an artist named Carolee Schneeman. At that time, Westview was a new corporation with no significant operating history. In November of 1978, petitioner received a copy of a document entitled "Confidential Memorandum, Offering of a Master Artwork by Westview Fine Arts, Ltd." (hereinafter referred to, relative to Issue 3, as "Memorandum"), which had been issued by Westview during that year.Pursuant to the offering set forth in that document, Westview offered to sell to prospective purchasers certain rights and interests in one or more of ten listed lithographic plates, each embodying a distinct image to be created by Carolee Schneeman, and each of which was also referred to as "the Master." Each such Master would consist of a piece of plastic (called an acetate) embodying an image, through which light would be passed resulting in the photographic transfer of such image onto a silkscreen, through which ink would then be passed in order to produce a fine art print. *287 According to the Memorandum, Westview had already obtained from Schneeman "an exclusive and irrevocable term option" to engage the latter to prepare the ten Masters, and to obtain from her the following rights therein: * * * all of the Artist's right, title and interest in and to the Master and ancillary rights therein, including (a) ownership of all copyrights, (b) all exclusive worldwide rights of use, manufacture, sale, promotion, advertisement, distribution, licensing, copying, displaying, production and duplication, and (c) the worldwide right to use the name, likeness and biography of the Artist in connection with the exploitation of the Master. The Memorandum also provided that Schneeman would personally participate in the production from each of the ten Masters of a "limited edition," to consist of 250 fine art prints and 20 artist's proofs. In exchange for her conveyance to Westview of the foregoing rights and performance of the foregoing services, Schneeman was to receive the following stated consideration: The Artist is to receive aggregate consideration for the Master and his [sic] services in connection therewith of $102,500: $2,500 in cash or certified check *288 and $100,000 evidenced by the Note. The "Note" referred to was a nonrecourse promissory note to be executed by the purchaser-investor in favor of Schneeman, as further described infra.
Pursuant to a so-called "purchase agreement," the form for which was appended to the Memorandum (with parties, dates and price terms omitted), the prospective investor was to obtain from Westview all of its "right, title and interest in and to the Master and ancillary rights therein," including each of the afore-described rights which Westview was to obtain from Schneeman. Total consideration for such purchase was summarized in the text of the Memorandum, as follows: The aggregate purchase price to be paid by the Purchaser for the Master shall be $125,000: (a) $12,500 in cash or certified check, (b) $12,500 evidenced by a secured promissory note executed by the Purchaser in favor of the Seller * * * to bear interest at 8 1/2% perannum, to have a final maturity date of January 15, 1979, and to be secured by an irrevocable letter of credit * * * established by a bank acceptable to the Seller * * * (note: the Purchaser retaining the option to combine (a) and (b) into a single *289 cash payment of $25,000), and (c) $100,000 evidenced by the Note. A form for the note referred to in paragraph (c) of the above excerpt, with price terms omitted, was appended to the Memorandum and was in the form of a nonrecourse note payable by the purchaser to Schneeman on or before December 31, 1987, bearing interest at the annual rate of six percent, and secured solely by a security interest in the Master and ancillary rights associated therewith. The form for the note also provided for both mandatory prepayments of principal and interest in amounts equal to 50 percent of any net receipts derived by the purchaser from exploitation of the Master, and optional prepayments at any time. Emphasized in capital letters was the limitation of the purchaser's obligation under the note to his right, title and interest in the collateral provided therefor. A form for an agreement to secure the note was also included, providing as sole security all of the purchaser's right, title and interest in and to the Master. The Memorandum provided that the purchaser was to receive two written appraisals of the value of the Master at the time of closing of the sale. It was also provided that *290 the purchaser was both "unconditionally obligated to produce a limited edition of fine prints from the Master," relative to which he was required to execute a so-called supervision agreement, and to use his best efforts "to engage in further production and distribution activities for the purpose of exploiting the Master," relative to which it was suggested that he might execute a distribution agreement. Pursuant to the required supervision agreement, the form for which was appended to the Memorandum, the purchaser would retain the services of an individual selected by Westview to supervise the production, including printing, of the limited edition of prints and artist's proofs. It was stated to be the intention of Westview that one Michael Krugman be used as the supervisor. At the time the agreement was executed, the purchaser was to pay Westview, as escrow agent, a total of $3,250, consisting of $3,000 for the costs of production and delivery of the limited edition, plus a $250 supervision fee for Krugman. Pursuant to the suggested distribution agreement, the form for which was appended to the Memorandum, a corporation known as "The Alternative Gallery System, Inc." (hereinafter *291 referred to as "TAGS") would use its best efforts to market the Master and prints produced therefrom for a period of ten years. In exchange for such services, the purchaser was to pay TAGS an initial payment of $2,500, all of which was to be applied by TAGS to the costs of promoting the Master, and a distributor's commission on each fine print in the limited edition and on the Master, to be computed pursuant to a stated formula. Under the agreement, TAGS was required to provide for insurance to cover the plate and the prints against all risks. With the purchaser's approval, TAGS was also to set the retail price of individual prints produced from the Master. The suggested distributor, TAGS, was a California corporation, which was incorporated with only minimal capital in May of 1978. TAGS' president and sole shareholder and director, Barbara Cleland, had no experience in the distribution or exploitation of fine art prints prior to her involvement with TAGS and with the Westview offering. Stating that the purchase of the Master "involves a high degree of risk and is suitable only for an individual of substantial personal means who has no need of liquidity and could bear an entire *292 loss of his investment," the Memorandum limited sale of the foregoing rights in the Master to those individuals whose personal net worth was at least $200,000, exclusive of homes, furnishings and automobiles, and whose taxable income was subject to Federal income tax at a rate of 50 percent or more. Also set forth in the Memorandum were certain "risk factors" associated with the investment, the first of which provided, in pertinent part, as follows: 1. Due to the competitive nature of the art market and the subjective nature of the public's acceptance of artwork, the profit potential of the Master is extremely speculative and an investment in the purchase of the Master is subject to a high degree of risk. * * * * * * All revenues from such commercial exploitation will be dependent upon the sales success of the objects and merchandise offered. Sales success will in turn be dependent upon, among other things, the ability and willingness of * * * a distributor * * * to arrange and pay for attractive advertising and promotion, to select appropriate release dates * * *, and to choose suitable shows, galleries, shops and other retail outlets * * *. This process is highly competitive *293 * * *.
* * * Without taking into consideration any additional gross proceeds which may be derived from any other exploitation of the Master, the average retail sales price of each of the * * * prints * * * will have to substantially exceed the retail sales price at which limited edition prints now produced by the Artist are being sold if prepayments of principal and interest in respect of the Note * * * are to be sufficient to discharge such obligation on or prior to its final maturity. It must also be noted that the size of the limited edition to be produced from the Master is significantly larger than limited editions normally produced by the Artist, which circumstance may have a depressing effect on the retail sales price * * * [of each print]. Accordingly, and notwithstanding the appraisals of the Master to be furnished to the Purchaser * * *, there is a substantial degree of risk that exploitation of the Master will not yield sufficient proceeds to enable the Purchaser to recoup all or any portion of his capital investment in the Master. [Emphasis added.] Other risk factors included the statement that Westview was a new corporation with no significant *294 operating history "and possessing minimal financial resources," and the possibility of respondent's challenge of the bases for "the favorable tax consequences which may be anticipated by the Purchaser." In emphasizing in capital letters that "THE FINANCIAL VALUE OF ORIGINAL ARTWORK IS NOT SUSCEPTIBLE TO ACCURATE OR EVEN APPROXIMATE ESTIMATION PRIOR TO INITIAL SALE AND/OR PUBLICATION," the Memorandum further stated that "THE LACK OF PREDICTABILITY AS TO THE PROFIT-EARNING POTENTIAL OF THE MASTER SHOULD BE CONSIDERED A MAJOR RISK FACTOR BY THE PURCHASER." Included in the Memorandum was a seven-page section devoted exclusively to the Federal income tax consequences of the investment, as well as a twenty-six page legal opinion which is also devoted exclusively to that subject. Other briefer discussions of the tax implications of the investment were set forth throughout the document. Also set forth in the Memorandum were statements of the background of Westview's founder, Kathy Beigel, and the artist, Carolee Schneeman. Kathy Beigel's background was described, in pertinent part, as follows: Ms. Beigel, 32 years of age, received a B.A. in art history from Finch College. Since *295 1976, she has been actively involved in the structuring and offering of investments and counseling with respect thereto * * *. Her prior professional experience during the past five years was as a buyer of women's fashions for Judy's of Van Nuys, California. Schneeman was described as a "painter, kinetic sculptor, film-maker, writer and pioneer of Happenings." Prior to the fall of 1978, petitioner had never invested or been otherwise involved in graphic art ventures, including the sale of lithographic plates or fine art prints, and had never heard of the artist, Carolee Schneeman. In deciding to enter into an agreement to purchase the Master, petitioner consulted with Beigel, Cleland, his accountant, Schwer, and his wife, Trese Harrington. However, petitioner had made only minimal efforts to investigate and was not aware of the reputations for honesty and integrity of either Beigel, Cleland or Westview. Petitioner also sought and received extensive advice concerning the tax implications of his prospective investment, consulting on this subject not only with Schwer on a regular and frequent basis, but also with members of a New York law firm, Betty Chamberline of the New *296 York Art Dealers Association, and at least one other individual. In August 1978, petitioner Trese Harrington invested in a company called Artcetera, Inc., which was founded by an individual who was involved in what Mrs. Harrington described as "art shelter packages," and which was engaged in the production of lithographic prints. Mrs. Harrington continued her association with Artcetera for approximately one year, and on their 1980 Federal income tax return, petitioners reported no income and claimed solely a nonbusiness bad debt relative to such activity. In or about September of 1978, Mrs. Harrington formed and invested in a corporation known as Sterling Graphics, Ltd., which was involved in the sale of lithographic prints. Since "that was when the tax shelter thing had come out as being being a bad investment," according to Mrs. Harrington, sales of prints by Sterling were poor.On their 1980 Federal income tax return, petitioners reported no income and claimed a nonbusiness bad debt and a worthless stock deduction relative to their interest in Sterling Graphics, Ltd.
Pursuant to the offering described in the Memorandum, on November 17, 1978, petitioner entered into a purchase *297 agreement to acquire from Westview all of its right, title and interest in and to one of the Master plates, [7] which embodied an image styled "The Men Cooperate," including (1) the exclusive right to use, manufacture, sell, promote, advertise, distribute, and license all or any part of such plate anywhere in the world; (2) the exclusive right to copy, display, produce and duplicate the plate anywhere in the world; (3) the non-exclusive right to use the name, likeness and biography of the artist in connection with exploitation of the plate; and (4) any and all common law and statutory copyrights in the plate. The purchase agreement was signed by petitioner and Kathy Beigel on behalf of Westview on November 17, 1978 on a form identical to the purchase agreement form which was appended to the Memorandum. Filled into the blank spaces on the form were *298 the names of the parties, appropriate dates and the purchase price terms, which provided for a purchase price of $125,000. Unlike the payment terms summarized in the text of the Memorandum, however, payment was to be made as follows: (1) $10,000 in cash to Westview; (2) $15,000 either in cash or by recourse promissory note payable to Westview; and (3) $100,000 by nonrecourse promissory note payable to Schneeman. Referenced in the purchase agreement is a so-called "Artist Agreement," allegedly executed in May 1978, and by which Westview purportedly obtained from Schneeman all of the rights to "The Men Cooperate" which it was conveying to petitioner. The purchase agreement sets forth petitioner's agreements to produce or to cause to be produced a limited edition of fine prints from the plate, consisting of 250 fine art prints and 20 artist's proofs, to use his best efforts to exploit the plate, to enter into a supervision agreement and to possibly enter into a distribution agreement, as described in the Memorandum. In accordance with the purchase agreement, petitioner executed a nonrecourse promissory note and security agreement in favor of Schneeman on November 17, 1978. With *299 the addition of the date, parties and the $100,000 amount, those documents were essentially identical to the corresponding forms appended to the Memorandum. On the same date, petitioner also executed a "secured promissory note," promising to pay Westview the agreed amount of $15,000 plus interest at an annual rate of 8 1/2 percent. Four days later, petitioner issued a check payable to Westview in the amount of $10,000, to cover the cash downpayment portion of the stated purchase price, and on March 5, 1979 petitioner issued a check payable to Westview in the amount of $15,206, consisting of the principal and interest due under the foregoing secured promissory note. On November 17, 1978, in addition to the purchase agreement and associated promissory notes, petitioner also entered into both a distribution agreement with TAGS and a supervision agreement with Michael Krugman. With the addition of the date and the parties, each such agreement was identical to the corresponding form agreement appended to the Memorandum. The selection of Krugman was made by Kathy Beigel prior to November 17, 1978, and without any input from petitioner. The selection of TAGS was made by petitioner *300 solely because it was the only distributor recommended by Westview in the Memorandum. Pursuant to the supervision agreement, on November 21, 1978 petitioner issued a check for $3,000, payable to Westview as escrow agent for the costs of producing the limited edition, and a check for $250, payable to Krugman for his supervisory services. Pursuant to the distribution agreement, on November 21, 1978 petitioner issued a check for $2,500, payable to TAGS for its distribution services. In or about May 1979, "The Men Cooperate" was printed in a limited edition consisting of 250 fine art prints and 20 artist's proofs. Of the total of ten images originally planned by Westview to be created by Schneeman and printed in such a limited edition, only five such images, including "The Men Cooperate," were in fact created and printed. Contrary to the provisions of the Memorandum, which stated that prospective investors were to receive two appraisals of the Master at the time of closing, only one appraisal of the plate embodying "The Men Cooperate" was prepared, and that was dated December 22, 1978, over one month after petitioner's execution of the purchase agreement and some five months prior *301 to May 1979, when the limited edition was printed. Such appraisal was prepared by Laurence Casper of New York at the request of Westview. The appraisal purports to be based upon the author's thorough review of "the history of the artist, the business history of the suggested distributor, and a marketing plan * * * of the possible sales potential of the * * * 'Master.'" After reviewing Schneeman's background, the appraisal concludes with the following evaluation of the plate: Ms. Schneemann [sic], in the color separated photo image "The Men Co-Operate", has created and left the meaning of the image to operate in a completely fluid conceptual relation to the viewer. Men co-operating, entering, leaving; to what goal? An average enough situation, but, is it as serene as it really appears? In the represented action, the viewer is consistently challenged. For example, the perceptual process, our social relations to the situation and equally the image as the articulation of human forms in space. Finally, hoping that the men will co-operate freely. The current market value of the plate (image) "The Men Co-Operate" is, in my opinion, at least $135,000. This evaluation *302 takes into consideration that the MASTER is first issued as a Limited Signed Edition of 250 and that each print is handworked by the artist to further enhance its commercial and esthetic value. Further utilization of this image may be pursued later by an unlimited reproduction of the print, posters, tapestry, fabric applications and the licensing of the image, various novelty purposes, such as the printing of jigsaw puzzles, greeting cards, etc. * * * As acknowledged by Schneeman at trial, fundamental to the commercial success and value of works of art is both scarcity and the previous sales history of the artist in related work.Typically, in the print publishing business a limited edition consists of up to 100 prints. In this case, a limited edition of 250 prints and 20 artist's proofs were printed from each of five lithographic plates created by Schneeman, and as of 1978, the artist had no significant history of prior print sales. As stated in the Memorandum and in her professional resume', Carolee Schneeman is "known as a painter, kinetic sculptor, filmmaker, writer and pioneer of Happenings." However, as acknowledged by Schneeman, she is most widely recognized in the *303 field of "performance art." Performance art is an art form generally involving non-narrative theatrical performances by an artist. Schneeman's performance art work is generally known, in particular, for its nudity and erotic content. Schneeman's resume', which was updated in November 1980, consists of 23 pages and contains no mention of her activities in the area of lithographic plate or print-making. The image created by Schneeman for "The Men Cooperate" does not exemplify the type of work for which she is best known. It is neither performance art, nor is it suggestive or erotic. Rather, "The Men Cooperate" consists of a collage of snapshot-type photographs, which have been photographically reproduced utilizing a silkscreening process.The several photographic images depict two men and a woman carrying boxes and represent, according to the artist, an "ordinary" event in her life wherein "my husband was leaving, and someone falling in love with me was moving in. And they decided to help each other in exchanging their books and clothing." The price for each print of "The Men Cooperate" was set by Cleland, pursuant to the distribution agreement, at $600.During late 1979, 1980 *304 and 1981, Cleland wrote on several occasions to petitioner, advising him of TAGS' efforts in promoting Schneeman and his prints. Included among such offorts were planned advertising and promotional tours, negotiations concerning sales to a European art gallery and exhibitions in California and at a New York art gallery. Cleland also advised petitioner that Schneeman had been the subject of an article appearing in "Art Forum" magazine. Despite these purported efforts, none of petitioner's prints were sold, and no efforts were made to exploit any ancillary rights, including posters, relative to the Master. TAGS was also the distributor for limited editions of prints produced from the four other Schneeman plates which had been handled through Westview, but none of these prints were sold either. As of the spring of 1979, TAGS was in possession of petitioner's prints, but contrary to its commitment in the distribution agreement, failed to insure such prints. No bank account was ever opened and no formal books and records were maintained by petitioner relative to his activities in exploiting "The Men Cooperate." As of the time of the trial in this matter, no payments had been made *305 to Schneeman under the nonrecourse note executed by petitioner on November 17, 1978. On Schedule C of their Federal income tax returns for 1978, 1979 and 1980, reporting that they were on the cash method of accounting, petitioners reported depreciation deductions relative to their purported business of selling fine art, in the respective amounts of $16,878, $22,894 and $17,806. Also related to such activity, petitioners claimed deductions, in 1978, for "advertising and promotion" in the amount of $2,500, and in 1979, for "consulting fees" in the amount of $2,500 and interest on business indebtedness in the amount of $206. Petitioners, reporting no income from such activity in any of the years in issue, claimed losses in 1978, 1979 and 1980 in the respective amounts of $19,378, $25,600, and $2,856. [8]
In addition to the foregoing claimed deductions, reporting a basis of $119,900 in new property with a life of seven years or more, in 1978 petitioners claimed an investment credit relative to the purported art sales *306 business in the amount of $11,990. In the same deficiency notice described relative to Shhh Associates, Ltd., supra, respondent disallowed the foregoing losses and investment credit in their entirety. As grounds for disallowance of the losses, respondent determined, inter alia, that petitioners had failed to establish that "the venture was entered into for profit, was a trade or business or was otherwise intended to produce income." OPINION Issue 1. Statute of limitations
Section 6501(a) provides, as a general rule, that: the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. Petitioners have the burden of proving when the return was filed, when the period of limitations expired, and that no notice of deficiency was properly sent to them within such period. UnitedStates v. Gurley,415 F.2d 144 (5th Cir. 1969); Robinson v. Commissioner,57 T.C. 735 (1972). In this case, *307 we have found that petitioners' returns for 1972, 1975 and 1976 were filed on or before April 15, 1973, April 15, 1976 and April 15, 1977, respectively. Accordingly, the normal period of limitations applicable to such years under section 6501(a) expired on April 15, 1976, April 15, 1979 and April 15, 1980, respectively, unless an exception was applicable. As we have further found, the notice of deficiency applicable to the foregoing years was mailed to petitioners by certified mail on March 24, 1982. According to petitioners, the period of limitations applicable to their tax years 1975 and 1976 had run at the time of the mailing of such notice. Respondent, on the other hand, takes the position that the foregoing period of limitations had not run at the time of the mailing of the notice of deficiency because of the existence of properly executed consents extending such period. Respondent relies upon section 6501(c)(4), which provides, in pertinent part, as follows: (4) Extension by agreement. -- Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, * * * both the Secretary and the taxpayer have consented in writing *308 to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. In thus contending for applicability of the foregoing exception, respondent bears the burden of introducing into evidence consents, valid on their face, which extend the period of limitations for assessment at least up to the date of mailing of the notice of deficiency. Robinson v. Commissioner,supra at 737; Concrete Engineering Co. v. Commissioner,19 B.T.A. 212 (1930), affd. 58 F.2d 566 (8th Cir. 1932). [9] After respondent introduces consents which are valid on their face, and petitioners assert that any such consent is ineffective, then petitioners bear the burden of proving the invalidity of such consent. Crown Willamette Paper Co. v. McLaughlin,81 F.2d 365 (9th Cir. 1936); Concrete Engineering Co. v. Commissioner,supra.
The consent forms *309 described in our findings were introduced into evidence as stipulated exhibits, and are timely and valid on their faces. Petitioners' position that the period of limitations applicable to their tax years 1975 and 1976 had run as of March 24, 1982, when the notice of deficiency was mailed, rests upon their contention that such consents were ineffective to extend such period of limitations under section 6501(c)(4). Citing a Memorandum Opinion of this Court, Robertson v. Commissioner,T.C. Memo. 1973-205, petitioners first allege that the consent forms are "inoperative" since they were obtained under duress. In support of this allegation, petitioners state on brief that "petitioner, Dennis C. Harrington, was led to believe that the Internal Revenue Service would immediately declare his alleged tax deficiency payable without further investigation if the petitioners did not sign the consent to extend the statute of limitations." The burden of proving that a consent is null and void by reason of its execution by petitioners under duress is upon petitioners. In this case, petitioners have produced no evidence to substantiate their allegations of duress. Further, since *310 petitioner was an experienced lawyer at the time he executed the subject consent, represented himself capably in the present action, and consulted with his accountant concerning tax matters on a regular and frequent basis, we find such alleged belief to be improbable. Second, petitioners also contend that we should nullify the subject consents because they were allegedly obtained in contravention of respondent's policy, as stated in Revenue Procedure 57-6, 1957-1 C.B. 729, of keeping to a minimum the number of consents secured from taxpayers. Once again, petitioners' allegation remains unsubstantiated on this record. Furthermore, as recognized in respondent's Revenue Procedure 79-22, 1979-1 C.B. 563, which applies solely to special consents reflected on Forms 872A, including the special consent executed by petitioners herein, "[i]t is often necessary to request extensions of the period of limitation in tax cases to provide adequate time for consideration of disputed issues," and "[i]t is often difficult * * * to forecast the time required for adequate consideration of a case, particularly where complex or intricate questions of fact or doubtful issues *311 of law are present." [10]
It is clear that petitioners have failed to meet their burden of establishing the invalidity of the subject consents. As to their tax years 1975 and 1976, petitioners are accordingly bound by such consents and respondent's assessments for those years are not time-barred. [11]
Issue 2. Shhh Associates, Ltd.
(a) Inclusion of nonrecourse *312 debt in basis
We must first decide whether the nonrecourse debt in the amount of $2,000,000 is properly includable in the basis of the film purchased by Shhh Associates, Ltd., the resolution of which will have a bearing on the amount of the depreciation deductions to which petitioners are entitled, if any. Generally, where property is acquired by purchase its cost includes the amount of liabilities assumed, or taken subject to, by the purchaser. Crane v. Commissioner,331 U.S. 1 (1947). The mere fact that the liability is secured only by the asset transferred, and that the purchaser otherwise has no personal liability (i.e., a nonrecourse note), will not alone prevent such liability from being included in the basis of the property. Mayerson v. Commissioner,47 T.C. 340 (1966). However, where the purchase price and the principal amount of the nonrecourse note each unreasonably exceed the fair market value of the property securing the note, the face amount of the note will not be included in the depreciable basis of the property. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *313 Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Odend'hal v. Commissioner,80 T.C. 588, 604 (1983), on appeal (4th Cir. December 19, 1983). In the present case, respondent contends that petitioners are not entitled to their share of Shhh Associates, Ltd.'s depreciation deductions which are attributable to the nonrecourse note. To rebut this contention, petitioners have been burden of proving that the fair market value of the film bore a reasonable relationship to its purchase price (or the principal amount of the nonrecourse note, see Brannen v. Commissioner,722 F.2d 695 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Odend'hal v. Commissioner,supra at 604), Welch v. Helvering,290 U.S. 111 (1933). Based upon all of the evidence presented herein, we conclude that petitioners have failed to meet that burden. Initially we note that, contrary to their contention, petitioners have failed to demonstrate that the $2,300,500 stated purchase price for the film resulted from any meaningful, arm's-length negotiations between Gable and *314 the partnership. See Siegel v. Commissioner,78 T.C. 659, 687 (1982). Thus, the record is devoid of any written correspondence between the parties concerning the purchase price or other terms of sale. Petitioners failed to present as a witness Carcaise or any other representative of the partnership who may have negotiated with Gable. In support of their claim that such negotiations occurred, petitioners rely solely upon the following testimony by Gable: Q. How much did you determine the selling price to be? A. The figure that we ended up with, came after a long, almost harangue series of negotiations. I was getting some -- fairly decent professional help on how to price a picture from Chuck Workman * * * [and] Ezra Baker certainly. * * * Q. All right. Now, what did you have to do with selling the picture to the Shhh Partnership? A. Again, I don't understand that question. I presented the picture to the persons they brought forth as the general partner. Q. All right. And that was who? A. A man by the name of Frank Carcaise. Q. And did you negotiate with Mr. Carcaise to get your figure? A. Yes. On this issue, petitioner acknowledged *315 at trial that while he had stated under oath in response toi respondent's interrogatories that the general partner of Shhh Associates, Ltd. did not negotiate with Gable for acquisition of the film, such response had been based upon conflicting information he had obtained from various parties, including Gable and LePrell, who was counsel to the partnership. Whether or not Carcaise actually participated in any discussions over sale of the film, we believe that the disparity between petitioner's interrogatory response, as explained at trial, and Gable's testimony suggests that no protracted or meaningful negotiations transpired, a suggestion which is confirmed by the total absence of evidence to corroborate Gable's perfunctory statement to the contrary. At trial, respondent presented four expert witnesses to evaluate the fair market value of the film, each of whom prepared detailed appraisals which were admitted into evidence and each of whom we found to be competent and persuasive. Three of the expert witnesses appraised the theatrical rights associated with the film, concluding that since the costs of distribution would exceed any income to be derived therefrom, such rights had *316 no value. The fourth witness appraised the television and ancillary market rights associated with the film, valuing such rights at $32,500. While these appraisals are not necessarily conclusive, we find it significant that neither such appraisals nor the production costs for the film, which were in the approximate amount of $200,000, were anywhere near the $2,300,500 stated purchase price for the film. See Siegel v. Commissioner,supra at 687. By contrast, petitioners, who presented no independent expert witnesses at trial, rely principally upon the two "appraisals" which were appended to the Memorandum. We accord no weight to these appraisals, however, since we believe that they were predicated upon superficial and flawed analysis, giving rise to grossly inflated estimates of the earning potential of the film, and were made by persons who were not disinterested parties. Both appraisals were dated well in advance of the completion of the film by Gable, so that neither appraiser could have screened the finished product. At the time of their appraisals, both appraisers either were currently or had been affiliated with the seller of the film -- Carl Workman *317 as president of the company which was employed by Gable to do production and post-production work on the film, and Ezra Baker, as a sometime business associate who was also initially involved in production of the film. Workman's appraisal, which relied heavily upon the "strength of the distributor" and the "excellent reputation and ability of [UA]," apparently assumed that the film would be distributed by UA, an assumption which was premature since UA's distribution of the film was only a possibility under the option agreement executed by Gable on May 13, 1975. Petitioners have also failed to demonstrate that either Baker, whose background was limited to the production of theatrical short films, or Workman, whose background was primarily in the area of the production of advertising "trailers," was qualified to appraise the earning potential and value of a feature-length film like "Shhh." Finally, each of the appraisals relied upon by petitioners, in marked contrast to those relied upon by respondent, contains only the most superficial analysis of the intrinsic merits of the film. In this regard, the appraisals prepared by Workman and Baker rely principally upon the expected "G" *318 rating and family appeal of the film. However, the appraisals fail to explain how this factor would help to sell the film in the market that existed in mid-1975, and we note the irony in Gable's advice to the partnership after the unsuccessful test marketing in 1975 and early 1976, that the film should be edited to achieve the more adult-oriented "R" rating. Under these circumstances, we do not find credible as fair estimations of the value of the film the two August 1975 appraisals which were appended to the Memorandum. Petitioners also rely as an indication of the fair market value of the film upon the testimony at trial of Arthur Reiman and Maurice Gable. We found Reiman to be a competent and credible witness, who would be qualified as the then-manager of UA's road show department to evaluate the box office potential of the film. However, while Reiman testified that he was optimistic about the film because of recent success of a "Bugs Bunny" cartoon anthology film as well as the quality and appeal of the shorts which had been selected, there is no indication on this record that he estimated the fair market value of the film at anywhere near the partnership's stated purchase *319 price.Indeed, Reiman's testimony that "I knew that this [film] was a tax shelter," and that he hoped that it would "strike lightening [sic] and make money," as well as the tentative nature of the option agreement negotiated by him for UA, suggests a considerably more reserved confidence in the film than that expressed by Workman and Baker in their appraisals. As for Gable's testimony - that while he believed that it war worth more, he settled for a selling price for the film in an amount recommended to him by Workman and Baker - we note initially that Gable's opinion constituted neither an independent judgment, nor, in light of his total lack of prior involvement in the production or distribution of feature length films, an expert judgment concerning the value of the film in 1975. Furthermore, we find additional support for our conclusion, that the stated purchase price for the film, $2,300,500, failed to reflect a reasonable estimate of its fair market value, in Gable's admission that such price was determined in consultation with Workman and Baker, whose estimations of the value of the film we have found to be grossly exaggerated. In sum, we conclude that the fair market *320 value of the film did not remotely approach the total stated purchase price of $2,300,500. Rather, on the evidence, we believe that the fair market value of the film in 1975 did not exceed $217,500, an amount which is approximately equal to the production costs and equal to the total amount of cash paid by Shhh Associates, Ltd. for the film. Accordingly, the note is not part of the partnership's investment in the film, and is not includable in its depreciable basis therein. [12]
(b) Profit objective
The next issue for decision is whether Shhh Associates, Ltd. entered into the subject transaction with the objective and intent of making a profit. Petitioners claimed deductions for depreciation and other business expenses, and also claimed investment credits. Section 167(a) permits a depreciation deduction for a reasonable allowance for the exhaustion of property used in a trade or business or property held for the production of income. Carrying on a trade *321 or business is also a prerequisite to deductibility of business expenses under section 162. An activity does not constitute a trade or business unless the taxpayer engages in the activity for the predominant purpose and intention of making a profit. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,supra at 698; Brannen v. Commissioner,supra, 78 T.C. at 505-506. The same kind of profit-making objective is a prerequisite for deductions under section 212(1) and (2), Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981), and for the investment credit under section 38. Flowers v. Commissioner,supra at 931, n. 24; Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Petitioners must establish herein that the film was purchased with the requisite profit-making objective. Wildman v. Commissioner,78 T.C. 943, 953 (1982); Siegel v. Commissioner,supra at 699. In determining whether the activity was engaged in for profit, all relevant facts and *322 circumstances must be taken into account, and greater weight should be given to the objective facts than to the parties' mere statement of their intent. Siegel v. Commissioner,supra at 699; Brannen v. Commissioner,supra, 78 T.C. at 506; section 1.183-2(a), Income Tax Regs. In the circumstances presented in the instant case, it is well established that the determination of profit-making intent must be made at the partnership level. Wildman v. Commissioner,supra at 953; Siegel v. Commissioner,supra at 698; Brannan v. Commissioner,supra, 78 T.C. at 505. Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity in engaged in for profit, including: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's *323 history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Applying the relevant factors to the instant case, we believe on balance that Shhh Associates, Ltd. purchased the film with an actual and honest objective of making a profit. We note at the outset that while the fair market value of the film certainly did not reasonably approximate the $2,300,500 Stated purchase price therefor, the value did at least approximately equal the cash price paid for the film, a factor which weighs in petitioners' favor. Siegel v. Commissioner,supra at 700; Brannen v. Commissioner,supra.
We also note that we rely heavily in our finding of a profit motive upon the principal-agent relationship which we find to have existed between the partnership and Gable subsequent to the partnership's acquisition of the film in September 1975. In this respect, we reject respondent's contentions that "Gable was not in any respect the agent of the partnership," and that "Gable was acting on his own when *324 he pursued the exhibition of 'Shhh' in the four test cities." By the terms of his September 1975 acquisition agreement with the partnership, which are excerpted in our findings, Gable was clearly committed to use his best efforts as agentofthepartnership to negotiate a national distribution agreement with UA. Since it was clear under Gable's May 1975 option agreement with UA that UA would not elect to exercise its option to distribute in the absence of a successful test marketing of the film, we believe that Gable's subsequent promotional efforts on behalf of the film were well within the scope of this agency agreement. Turning to an evaluation of the relevant factors, we believe that the partnership was generally conducted in a businesslike manner. Gable, as agent of the partnership, was actively and continuously involved in promotion of the film, writing to the partnership on several occasions to keep it informed, and spending $26,400 on an advertising campaign which included television and radio commercials, market research surveys, artwork and buttons. Prior to the test market opening in Omaha, Gable reoriented the advertising campaign in an effort to improve *325 the profitability of the film. Furthermore, the general partner, Carcaise, communicated with the limited partners in writing following the initial test marketing of the film, advising them of the results and of the continuing efforts of Gable and UA to make the film a success. After UA's determination not to distribute the film, the partnership responded to the recommendation of its counsel, LePrell, to appoint a new general partner who would more actively promote the film and to give consideration to a further investment in order to edit the film to an "R" rating. See section 1.183-2(b)(1), Income Tax Regs.
As to the expertise of persons associated with the partnership, while Carcaise brought no experience in the motion picture industry to his position as the original general partner of Shhh Associates, Ltd., we believe that the partnership relied upon consultation with experienced advisors in its efforts to make the film a success. Thus, the business of marketing the film was handled for the partnership by Gable, who had previously marketed films for Trans World Airlines, and produced both a documentary for the Catholic Church and a number of short films in conjunction with *326 Ezra Baker for distribution by UA and others, and Gable was assisted in this effort by Arthur Reiman and by UA's field personnel. We are mindful, as respondent contends, that Gable had no experience prior to his involvement with "Shhh" in the production or distribution of full length feature films. However, the fact that Gable's experience was in the area of short films was especially significant in light of the content of "Shhh," and in any event, as stated by this Court in another movie partnership case, "[t]aken to its logical extreme, respondent's reasoning would prevent any taxpayer from ever entering into an untried business venture, because any initial effort would not be backed by identical previous experience," and "[s]uch is not the requirement of section 183." [13] See section 1.183-2(b)(2), Income Tax Regs.
Pursuant to section 1.183-2(b)(3), Income Tax Regs., "[t]he fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity." While there is *327 no evidence that Carcaise (or his successor, Solkovy) expended any substantial time and effort in exploiting the film, our findings clearly support the conclusion that Gable, acting as an agent of the partnership, together with responsible UA personnel, devoted a good deal of their personal time, effort and expense to promotion of the film. We find highly persuasive of a profit-making objective the fact that at the time the partnership acquired its interest in the film from Gable in September 1975, the film was subject to the May 1975 letter agreement Gable and UA. While we agree with respondent that UA's commitment to the film under such agreement was cautious and conditional, we are convinced that even the possibility of full participation by this major distributor, as provided in the May 1975 agreement, enhanced the attractiveness of the film as a potentially profitable venture in September 1975 to the partnership and its investors. We believe that this attractiveness may have been further enhanced by the optimism of responsible UA agents, and by UA's active participation in the test marketing efforts. At trial, UA's Arthur Reiman discussed the reasons for his optimism concerning *328 the film, as follows: Well, the very reason we took on "Shhh" aside from my own love of these subjects was, at the time Warner Brothers had taken all the "Bugs Bunny" * * * cartoons. They had strung them together on a similar principal [sic] with a bridging effect * * *. At that time, and they were not through with the release, * * * they had taken in an [sic] excess of $3 million * * *. And that's what intrigued us.We figured, if they can do this with cartoons that was [sic] similar, that we had such unique and different shorts that were so exciting and interesting, that we could create something really exciting in this film. Reiman further described his positive impressions of several of the short films which comprised "Shhh," in pertinent part, as follows: Well "Skater Dater" was probably the most popular short ever made. * * * And it struck a responsive chord with everybody that saw it. * * * "Crunch Crunch" was an animated -- and incidentally "Skater Dater" was nominated for an Academy Award. It probably won more awards than any short ever released. "Crunch Crunch" in 1971 won the Academy Award for best animated [sic] picture. * * * "Solo" was probably *329 the greatest ode and inspiration that I've ever seen. * * * "One Arm Bandit" was a short with Paul Price, who was probably -- he's household word. * * * It was a very, very comic bit. * * * As Reiman further testified, final approval of the film was made by his supervisor, Velde, at "the top echelon" of UA, and he too found that the idea was "unique and different." According to Reiman, in "no way would [Velde] have accepted 'Shhh' * * * if he didn't think this was going to make money." Consistent with this optimism at UA concerning the film, Reiman and other UA personnel provided substantial assistance to Gable in connection with his test market promitional efforts. Finally, other factors that suggest that the partnership had a profit objective are that the partners had been informed in the Memorandum that a number of the short films comprising "shhh" had been nominated for and/or won awards, including Academy Awards, that Gable carefully selected the shorts comprising the film through a live testing selection process and that the elements of personal pleasure or recreation which are often involved in activities not engaged in for profit were absent in the instant case. *330 See section 1.183-2(b)(9), Income Tax Regs.
In sum, the motion picture industry is a highly speculative business. Only a small percentage of the movies produced ever make a profit. However, this does not necessarily imply that the purchase of a film is not an activity engaged in for profit. See section 1.183-2(a), Income Tax Regs. Although tax motives played a significant role in the purchase of "Shhh," we find on balance that Shhh Associates, Ltd. acquired the film with the objective of making a profit. (c) Distributive share of losses and investment credit
For their tax years 1975, 1976, 1978, 1979 and 1980, petitioners claimed their 3.8 percent distributive share of reported losses and investment credits from the partnership. For the reasons described in our findings, respondent disallowed such claimed losses and credits in their entirety for each such tax year. Having determined that the nonrecourse debt must be excluded from the depreciable basis of the film and that the partnership was carrying on the trade or business of promoting the film for profit, we turn next to a consideration of the items set forth in Table 5 in our findings which contributed to the partnership's *331 computation of such losses and investment credits.In this regard, petitioners bear the burden of proving their entitlement to a distributive share of each such item. Welch v. Helvering,supra; Rule 142(a). (1) Depreciation
The greatest portion of petitioners' claimed losses is attributable to the partnership's depreciation in 1975 and 1976 of its alleged basis of $2,300,500 in the film, in the amount of $804,692 in each such year. [14]
Section 167(a) provides that a taxpayer shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion of property used in a trade or business or held for the production of income.With respect to motion picture films, respondent has authorized use of the income forecast method to compute depreciation. Revenue Ruling 60-358, 1960-2 C.B. 68; Revenue Ruling 64-273, 1964-2 C.B. 62. This method was authorized in recognition of the difficulty *332 of measuring the useful life of a motion picture. Under this method, the depreciation deduction is computed by multiplying the depreciable basis of the film by a fraction, the numerator of which is the net income [15] derived from the film in the taxable year, and the denominator of which is the estimated total income to be derived from the film during its useful life. Use of the income forecast method to depreciate motion pictures has been approved by this Court in a number of cases. See Greene v. Commissioner,81 T.C. 132 (1983); Wildman v. Commissioner,supra;Siegel v. Commissioner,supra.
According to respondent, having adopted the income forecast method to depreciate the film in 1975, the partnership was bound to use that method in 1975 and 1976. Since petitioner have failed to demonstrate that the film generated any income for the partnership in 1975 and 1976, *333 respondent further contends, petitioners were entitled to no deductions for depreciation of the film in those years. According to petitioners, on the other hand, the method of depreciation actually used by Shhh Associates, Ltd. was the straight line method, rather than the income forecast method as stated on the partnership's returns.In support of this contention, petitioners allege that since the partnership's tax returns for 1975 and 1976 failed to contain a calculation of forecasted income and since the depreciation deductions actually reported were based upon financial projections made by G.L. Roteman & Associates prior to release of the film, and thus prior to the availability of any income forecasts, the partnership could not have actually computed depreciation under the income forecast method. Thus, petitioners contend, the partnership is entitled to depreciate the film under the straight line method for the years in issue. Pursuant to section 1.167(c)-1(c), Income Tax Regs., a method of computing depreciation may be adopted by a taxpayer, without formal election, by simply computing depreciation under the method chosen. Generally, however, any change in the method of computing *334 depreciation is a change in method of accounting, which will be permitted only with the consent of the Commissioner. Section 446(e); section 1.167(e)-1, Income Tax Regs. It is clear that in the case of a proposed change from the income forecast method to either an accelerated or straight line method, such consent must be secured. Wildman v. Commissioner,supra at 951. [16] It is also clear that once a taxpayer has adopted the income forecast method, his use of such method in a defective manner will not serve to vitiate the foregoing consent requirement. Wildman v. Commissioner,supra at 952. We accordingly turn to a consideration of the method of depreciation adopted by petitioners, in light of the foregoing legal principles. As we have found, the Memorandum which was received by petitioner as a prospective investor in Shhh Associates, Ltd., contemplated that the partnership would use the income forecast method of depreciation for the film. Thus, highlighted as a risk factor of the investment was the possibility that respondent might challenge the partnership's *335 depreciation computation, including its "estimated receipts anticipated for the Picture." A calculation of estimated receipts, while an integral part of the income forecast formula, would be unnecessary to a computation of straight line depreciation. Appended to the Memorandum was a legal opinion prepared by Samuel LePrell, counsel to the partnership, similarly providing that the film would be depreciated under the income forecast method and explicitly referencing the foregoing revenue rulings, which authorize the use of such method for the depreciation of motion picture films. As we have also found, on August 13, 1975, the accounting firm G.L. Roteman & Associates prepared financial projections relating, inter alia, to depreciation of the film under the income forecast method. According to these projections, use of such method by the partnership would result in deductions in each of its tax years 1975 and 1976 in the approximate amount of 35 percent of the alleged depreciable basis of the partnership in the film, for a projected deduction in each such year of $804,692. On its partnership return for 1975, Shhh Associates, Ltd. rported that it had a depreciable basis in the film *336 in the amount of $2,300,500, and that the film had a useful life of 12 years. Under these assumptions, had the partnership adopted the straight line method of depreciation, it could have reported annual deductions in the maximum amount of $197,708. Instead, on each of its returns for 1975 and 1976, which were also prepared by G.L. Roteman & Associates, the partnership clearly stated that it was using the income forecast method, and consistent with the foregoing projections, reported an annual deduction for depreciation of the film in the amount of $804,692. Finally, on its returns for each of the years 1976 through 1981, the partnership reported that it was using the straight line method to depreciate its alleged basis of $14,270 in "prints" over a ten-year period, indicating that the partnership knew how to reflect its adopting of that depreciation method on its Forms 1065. On this record, petitioners have failed to meet their burden of proving that Shhh Associates, Ltd. adopted any method of depreciating the film in 1975 other than the method which it reported on its returns for that year, the income forecast method. [17] In so holding, we do not doubt petitioners' foregoing *337 assertion that the deductions reported by the partnership were based upon financial projections prepared by G.L. Roteman & Associates prior to release of the film, projecting that the film would not approximately 35 percent of its estimated total income in each of the years 1975 and 1976. However, we believe that this assertion suggests that the partnership used anticipated rather than actual income derived from the film as the numerator in computing its deductions under the foregoing income forecast fraction, a computation which was clearly improper, Wildman v. Commissioner,supra at 951, rather than that the partnership never adopted the income forecast method at all. We are accordingly in agreement with respondent that the partnership adopted the income forecast method to depreciate the film in 1975. Since the partnership failed to secure the requisite consent to change this adopted method, petitioners are limited in 1975 and 1976 to their distributive share of any depreciation of the film which would have resulted from the proper application of such method in those years. *338 It is uncontroverted herein that the film generated no gross income for Shhh Associates, Ltd. in 1975, and that no gross income was reported by the partnership in that year. Application of the income forecast method for 1975 therefore results in no deduction for depreciation of the film in that year. Greene v. Commissioner,supra;Wildman v. Commissioner,supra;Siegel v. Commissioner,supra.
As reflected in Table 5 in our findings, in 1976 the partnership reported gross income in the amount of $6,616. According to respondent, petitioners have failed to prove that any such income was realized by the partnership in 1976. We disagree. The partnership return reflecting such income was admitted into evidence herein as a stipulated exhibit, and respondent has failed to introduce any evidence to rebut the income figure reported thereon. Further, we have found that the film generated $3,509.14 in film rentals for UA in its first three test market showings, and that this amount was paid over to Gable by UA as reimbursement for his promotional expenses.By the terms of the acquisition agreement, the partnership acquired *339 from Gable all of his rights, title and interest in and to the film. In light of these facts we believe that it is reasonable to conclude, and we do, that the film generated a total of approximately $6,616 in film rentals in all four test market releases, that this amount, still being substantially below Gable's out of pocket costs, was paid over to him by UA, and that Gable, in turn, paid such amount over to the partnership. [18]
We have therefore found that the partnership realized income from the film in the amount of $6,616 in 1976. Since, as respondent apparently concedes, such sum was net of any distribution costs, we believe that $6,616 is properly includable as the numerator of the income forecast fraction for 1976. It remains for us to decide whether this record provides sufficient *340 basis to establish the denominator of such fraction, that is, estimated total income to be derived from the film during its useful life, so as to provide the basis for computing a depreciation deduction for that year. Pursuant to Revenue Ruling 60-358, 1960-2 C.B. 68, the income forecast denominator may be adjusted each year, as follows: If in subsequent years it is found that the income forecast was substantially overestimated or underestimated by reason of circumstances occurring in such subsequent years, an adjustment of the income forecast for such subsequent years may be made. In such case, the formula for computing depreciation would be as follows: income for the taxable year divided by the revised estimated income (the current year's income and estimated future income), multiplied by the unrecovered depreciable film cost remaining as of the beginning of the taxable year. The total forecast or estimated income to be derived from the films should be based on the conditions known to exist at the end of the period for which the return is made. According to petitioners, the denominator of the income forecast fraction in 1976 would be the same as the numerator, *341 or $6,616, since at that time "it could be reasonably anticipated that no further proceeds would be received from theatrical distribution," and "use of the income forecast method does not require including anticipated television proceeds in the denominator." Respondent contends that the partnership must include in the denominator the anticipated revenue from television and ancillary markets, and that petitioners have failed to demonstrate the forecasted amount of any such revenue. Contrary to his argument on brief, respondent, acknowledging that "[t]he forecasting of future income that may be realized from television exhibition of films produced for theatrical exhibition * * * is generally speculative and unpredictable," has countenanced the exclusion from the income forecast fraction of domestic-produced films which are released for theatrical exhibition after December 31, 1970. Revenue Procedure 71-29, 1971-2 C.B. 569.We believe that an estimation of the television and ancillary market potential of "Shhh" in 1976 would have been highly speculative in the circumstances of this case, and we decline to hold that the partnership was required to make such an estimation *342 in computing its depreciation deduction for that year. We also agree with petitioners that it could be reasonably anticipated that no further proceeds would be received by the partnership from theatrical distribution of the film after 1976. The fourth and final unsuccessful test market showing in Omaha ended on March 27, 1976. As a result of the test market showings, UA elected in 1976 not to exercise its option to distribute the film. While it is not clear on this record whether or not UA terminated Gable's rights to use the UA shorts at this point, it appears that UA was entitled to do so under paragraph 9 of its letter agreement with Gable. In any event, between 1976 and the time of the trial in this matter, the film was in fact shown neither theatrically nor for any other purpose. Accordingly, we conclude that the net proceeds received by the partnership in 1976, in the amount of $6,616, constituted a reasonable forecast of total income which would be received by the partnership over the life of the film, giving rise to an income forecast fraction in 1976 of $6,616/$6,616. We have already concluded that the $2,000,000 nonrecourse note was not part of the investment of the *343 partnership in the film, and is therefore excluded from its depreciable basis. The partnership's depreciable basis in the film is therefore limited to its cash investment, which we have found to be in the amount of $217,500. Applying the income forecast fraction, thus derived, to the partnership's depreciable basis in the film, we conclude that the partnership was entitled to report a deduction for depreciation of the film in 1976 in the amount of $217,500, and that petitioners were entitled to their 3.8 percent distributive share of loss attributable thereto. As reflected on Table 5 in our findings, the partnership also reported depreciation of its alleged basis of $14,270 in "prints" on its returns for tax years 1976 through 1981, inclusive, and petitioners deducted their distributive share of such depreciation on their returns for the years in issue. There is no evidence to support or even to explain this claimed deduction, and we therefore sustain respondent's disallowance of this item. (2) Payment to partners, taxes, amortization, legal fees, accounting fees, office expense, premiere expense, interest, bank service charge
As to the remaining expenses reported by the *344 partnership, and described in Table 5 in our findings, petitioners have offered no evidence to prove that any such expenses were incurred or paid by the partnership in any of the years in issue. As to such alleged expenses, petitioners argue only that respondent "failed to present any evidence at trial to disprove that any of these transactions occurred in fact or in substance," suggesting a misunderstanding as to their burden of proving entitlement to deduct their share of such expenses. Welch v. Helvering,supra;Helvering v. Taylor,293 U.S. 507, 514 (1935). As to all such items, we therefore sustain respondent's determinations. (3) Investment credit
On its partnership tax return for 1975, Shhh Associates, Ltd. reported a qualifiying investment of $2,300,500 in new section 38 property having a useful life of seven years or more. The $2,300,500 figure corresponds to the basis reported by the partnership for depreciation purposes; that is, cash of $300,500 plus a nonrecourse note in the amount of $2,000,000. On their 1975 Federal income tax return, petitioners claimed $87,419 as their 3.8 percent share of the partnership's basis in *345 this investment, resulting, together with other claimed qualifying investments, in a tentative investment credit in the amount of $9,070, and a claimed credit in the amount of $1,661. In April 1976, petitioners filed a Form 1045, seeking to carry back the unused portion of such tentative credit, or $7,409, from 1975 to 1972. Respondent has disallowed the portion of such tentative credit which relates to the investment of Shhh Associates, Ltd., or $8,742, consisting of the entirety of the claimed carryback to 1972 ($575 of which, according to respondent, was previously disallowed) plus a portion of the investment credit actually claimed in 1975. Section 38(a) allows a credit against tax for investments in certain depreciable property, also referred to as section 38 property. Generally, the amount of the credit is based on a taxpayer's depreciable basis in the property. Section 46(c)(2).With respect to motion picture films, however, the amount of the credit is based not on the depreciable basis but on the amount of "qualified United States production costs." Section 48(k)(4). [19] See Wildman v. Commissioner,supra at 954. Such costs are defined in section *346 48(k)(5), as follows: (A) In General. -- For purposes of this subsection, the term "qualified United States production costs" means with respect to any film -- (i) direct production costs allocable to the United States, plus (ii) if 80 percent or more of the direct production costs are allocable to the United States, all other production costs other than direct production costs allocable outside the United States. Pursuant to section 1.48-8(g)(1), Income Tax Regs., if a taxpayer purchases a qualified film before it is placed in service, the purchaser's qualified United States production costs are equal to the lesser of the total qualified United States production costs of the seller or the fixed purchase price of the film. In the instnat case petitioners have failed to meet their burden of proving either the amount of the seller's direct production costs for the film, within the meaning of section 48(k)(5) and section 1.48-8(e)(2), (f), Income Tax Regs., or the extent, if any, to which such costs were allocable to the United States, within the meaning of section 48(k)(5) and section *347 1.48-8(f)(2), Income Tax Regs.[20] Since we are accordingly unable to determine the amount of petitioner's qualified United States production costs under section 1.48-8(g)(1), Income Tax Regs., we must sustain respondent's determination as to this issue. [21]
*348 Finally, on its partnership tax return for 1976, Shhh Associates, Ltd. reported an investment credit of $14,270 in "new" section 38 property having a useful life of seven years or more. On their 1976 return, petitioners claimed $542 as their 3.8 percent share of the partnership's alleged basis in this investment, resulting in a claimed credit in the amount of $54. Since petitioners presented no evidence to explain or substantiate this claimed credit, we sustain respondent's determination as to this item. Issue 3. Westview Fine Arts, Ltd.
(1) Depreciation, investment credit, and advertising, promotion and consulting expenses
For the reasons set forth in section (b) of our discussion concerning Shhh Associates, Ltd., supra, each of the items of expense and investment credit claimed by petitioners relative to the present issue depends upon a determination that petitioner entered into the Westview venture with an actual, honest and predominant purpose of making a profit. Since we believe that this record, viewed in light of the legal principles and relevant criteria set forth in section (b) of our discussion of Issue 1, clearly discloses the absence of such a profit *349 motive, and since petitioners failed to realize any income during 1978, 1979 or 1980 from the Westview activity, we sustain respondent's determinations as to each of these items, except the claimed interest expense deduction, which is discussed infra.
We rely heavily in this determination upon the thoroughly unbusinesslike manner in which petitioner entered into the subject activity. See section 1.183-2(b)(1), Income Tax Regs. Petitioner was cautioned in the Memorandum that the profit potential of the print sales activity was "extremely speculative," and that the investment was subject to a "high degree of risk." Thus, the Memorandum notes that while the size of the limited edition is "significantly larger" than limited editions normally produced by the artist, having the effect of depressing the sales price of the prints, such sales price would nonetheless have to "substantially exceed" the price at which other Schneeman limited editions were sold in order to generate sufficient income to pay the nonrecourse note. Juxtaposed in the Memorandum with this apparent formula for the economic failure of the print selling venture were extensive and detailed descriptions of the *350 beneficial Federal income tax implications of the proposed investment, and the requirements that purchasers possess a personal net worth in the minimum amount of $200,000, and be in a 50 percent tax bracket. As in Flowers v. Commissioner,supra at 936, this is a case where there is very little in the Memorandum to inspire a belief that sales would ever be substantial. There is no indication that any profit projections were ever provided to prospective investors, and as a whole, the Memorandum "accentuates the beneficial tax consequences, and the concurrent risks, while placing relatively little emphasis upon any potential return that might be expected from * * * sales." Flowers v. Commissioner,supra.
In November 1978, when he entered into the Westview venture, petitioner had never invested or been otherwise involved in a graphic art venture, and had no prior knowlege of Carolee Schneeman. Petitioner claims, however, that he relied upon expert advisors, including Schwer, Beigel, Cleland, and his wife, Trese Harrington. There is no evidence that Schwer, who was petitioner's accountant and who had also advised him with respect to the *351 Shhh Associates, Ltd. venture, was expert in the activity of producing or marketing fine art prints. Similarly, we have found that Cleland brought no experience in the distribution or exploitation of fine art prints to her involvement with Westview. The professional experience of Beigel, who was the prime promoter of the Westview venture, was described in the Memorandum as including solely employment as a women's clothing buyer and involvement in the "structuring and offering of investments and counseling with respect thereto," and in 1978, Westview had no significant operating history and only minimal resources. Notwithstanding the inexperience of these principal actors, at the time he entered into the agreement to purchase the Master from Westview, petitioner had made only minimal efforts to investigate and admittedly was not aware of the reputation for honesty and integrity of either Beigel, Cleland or Westview. As for petitioner Trese Harrington, we are not convinced that her acknowledged experience with two companies involved in packaging art tax shelters, particularly in view of their apparent history of losses, would qualify her as an expert advisor within the meaning of *352 section 1.183-2(b)(2), Income Tax Regs. See also section 1.183-2(b)(5), Income Tax Regs.
By contrast, as we have found, petitioner sought and received extensive tax advice concerning the Westview investment, consulting with Schwer on a regular and frequent basis, and with a number of other individuals. At no time did petitioner ever seek or obtain an independent appraisal of the value or earning potential of the Master. While the Memorandum provided that at the time of closing he was to receive two written appraisals of the Master, to be prepared at the request of the seller, petitioner actually received only one such appraisal, and it was dated December 22, 1978, or over one month after his purchase of the Master. Even had such appraisal been received prior to his purchase, however, we are not convinced that it would have provided a reliable basis for confidence in the commercial potential of the venture. The appraisal purports to be based upon Schneeman's experience, TAGS' business history and the existence of a purported marketing plan for the Master. As of the time petitioner entered into the purchase agreement, however, Schneeman was most known for her erotic performance *353 art and had no significant history of print sales, TAGS was a new and minimally capitalized distributor, whose founder was inexpert in art distribution, and there is no evidence that a formal marketing plan had been developed. The appraisal also takes account of the possible "unlimited reproduction of the print" following production of the limited edition. As we have found, however, investors had already been cautioned in the Westview Memorandum that the size of the limited edition might be too large, having the effect of depressing the sales price for the prints. Furthermore, while the appraisal purports to fix a value on the Master prior to any retail print sales, the Memorandum admonishes investors in capital letters that the value of artwork cannot be even approximately estimated prior to the publication and/or sale of prints. Finally, the brevity, obscurity and superficiality of the appraisal, the pertinent portion of which is excerpted in our findings, belie its significance as a fair estimation of the value of the Master, or as an indication of the potential success of the venture. See Flowers v. Commissioner,supra at 933. By contrast, respondent entered *354 into evidence herein two appraisals of the Master prepared by independent experts whose testimony we found to be competent and credible. We are particularly impressed by the comprehensive appraisal and testimony presented by Dr. Richard S. Field, associate director and curator of prints, drawings and photographs at the Yale University Art Gallery, who estimated that as of November 1978 petitioner would net income from exploitation of the Master, after the 50 percent mandatory payments to Schneeman, in the amount of $3,430, and that his expenses would exceed that amount by some $2,570. Respondent's other expert witness similarly concluded that petitioner's costs would exceed his income. We find support for these estimates in the facts that while scarcity and previous sales history are fundamental to the commercial success of a work of art, as acknowledged by the artist, petitioners caused to be produced a "limited edition" of prints consisting of 250 prints and 20 artist's proofs, well in excess of the customary size of a limited edition in the print publishing industry, that this was only one of five such limited editions of Schneeman works simultaneously being handled by Westview *355 and TAGS, that Schneeman had no significant history of print sales, and that "The Men Cooperate" did not exemplify the type of work for which she was bast known. On the strength of these expert appraisals and the testimony of their authors, we conclude that the principal amount of petitioner's nonrecourse indebtedness to Schneeman, or $100,000, was greatly in excess of the fair market value of the property he acquired from Westview in November of 1978. A purchase price that is thus grossly inflated by means of nonrecourse indebtedness is suggestive of an acquisition undertaken to generate tax benefits, and contributes to a finding that the activity with respect to which the property was acquired was not entered into for profit. Flowers v. Commissioner,supra at 937. We also find significant herein the absence of evidence to indicate that the terms of the sale of the Master to petitioner were the subject of any meaningful negotiations with Westview. To the contrary, each of the relevant agreements was executed on a pre-printed form, identical to corresponding forms appended to the Memorandum, and complete with all terms and conditions, except price. In all *356 material respects, even the price terms filled into the blank spaces on such agreements were identical to the price terms described within the text of the Memorandum. [22] Furthermore, to supervise the printing of his plate, petitioner unquestioningly accepted Beigel's designated supervisor, Krugman, and despite the cautionary suggestions in the Memorandum that sales depended upon the careful selection of a distributor, petitioner also unquestioningly accepted Beigel's suggested distributor, TAGS, a company which we have found to be inexperienced and minimally capitalized. In short, petitioner's actions in entering into the Westview venture bespeak not merely a subordinate interest in profitability of the art sales activity but almost an indifference to that objective. *357 Finally, we are additionally persuaded by the facts that petitioner failed to open a bank account or to maintain formal books and records relative to his exploitation of the Master, see section 1.183-2(b)(1), Income Tax Regs, that TAGS failed to adhere to its commitment to insure the Schneeman prints against all risks while they were in its possession, and that during the years in issue, petitioners consistently reported losses and no occasional income from their exploitation of "The Men Cooperate," see section 1.183-2(b)(6), (7), Income Tax Regs.
On this record, petitioners have clearly failed to prove that their print sales activity during 1978, 1979 and 1980 was an activity engaged in for profit within the meaning of section 183. Since the subject deductions would not be allowable without regard to whether such activity was for profit, and since petitioners realized no income from such activity in any such year, they cannot avail themselves of the allowance provisions of section 183(b). (2) Interest on business indebtedness
As we have found, petitioners claimed a deduction in 1979 for interest on business indebtedness in the amount of $206.While our finding that the *358 subject activity was not engaged in for profit precludes petitioners' eligibility for this deduction under section 162, as claimed, a deduction for this interest payment on petitioners' $15,000 recourse indebtedness to Westview is allowable under sections 163 and 183(b). All other issues having been resolved by agreement of the parties, Decision will be entered under Rule 155.
Footnotes
1. Form 872A extends the period of limitations to a date 90 days after: (1) Mailing by the Internal Revenue Service of written notification to the taxpayer of termination of its consideration; (2) receipt by the Internal Revenue Service office considering the case of written notification from the taxpayer of election to terminate the agreement; or (3) mailing by the Internal Revenue Service of a notice of deficiency; except that, in the event such notice of deficiency is sent to the taxpayer, the time for making an assessment for the periods stated in such notice will expire 60 days after the period during which the making of an assessment is prohibited.↩
2. "You," as used in the letter, refers to Maurice Gable.↩
3. Our determination that Gable's advertising costs for the film totaled approximately $26,400 rests upon several considerations.First, the parties have stipulated herein that the film was test marketed in four cities, and that in the first three such cities, advertising costs in the aggregate amount of $21,452 were incurred. Second, the parties have additionally stipulated that certain advertising efforts were undertaken in the fourth and last test city, but have not stipulated as to the cost of such efforts. Petitioners' witness, Arthur Reiman, however, repeatedly testified that an approximate total of $20,000 was spent on advertising by Gable, consisting of approximately $5,000 in each of the four cities. We accordingly find that total advertising costs for the film consisted of approximately $21,452 incurred in the first three cities plus $5,000 incurred in the fourth city. On this record, we find unpersuasive petitioners' assertions and Gable's vague testimony that he incurred some $75,000 in advertising costs relative to the film.↩
4. While a stipulated exhibit reflects alleged additional film rentals deriving from testing of the film in "Belleville," in the amount of $167.25, this record is devoid of any explanation of such a test showing or of any credible substantiation that such an amount was received.↩
5. All statutory references herein are to sections of the internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, unless otherwise stated.↩
6. According to such deficiency notice, "[a] previous examination report reduced the carryback by $575.00." Disallowance of the sum of $6,834 and $575 would result in total disallowance of the unused investment credit from 1975.↩
7. The purchase agreement defines "plate" as "one or more copper etching plates, lithographic stones, printing blocks or screens, photographic negatives, transparencies and/or photoscreen negatives which together embody an Image made by the Artist, from which a 'Print' * * * or other reproduction of such Image can be created * * *."↩
8. The amount of the loss claimed for 1980, which is less than the $17,806 deduction for depreciation reported for that year, remains unexplained on this record.↩
9. See also Cindrich v. Commissioner,T.C. Memo. 1984-294↩.
10. We note, in any event, that the procedural rules cited by petitioners are directory rather than mandatory, and would not necessarily serve to invalidate respondent's actions herein. See Bridges v. Commissioner,T.C. Memo. 1983-763↩.
11. Petitioners seem to suggest that assessment of any deficiency for 1972 would also be time-barred. As we have found, petitioners' tax year 1972 is involved herein only as a result of a claimed carryback of unused investment credit from their tax years 1975. Pursuant to sec. 6501(j), assessment of a deficiency for 1972 attributable to disallowance of the carryback of unused investment credit from 1975 would not be barred where, as here, the statute of limitations for 1975 was open as of the time of issuance of the statutory deficiency notice.↩
12. Our disposition of this issue makes it unnecessary for us to consider the alternate grounds urged by respondent, that the nonrecourse note is too contingent to be included in the depreciable basis of the film.↩
13. Silberman v. Commissioner,T.C. Memo. 1983-782↩.
14. The remaining $713 of depreciation reported by the partnership in 1976, which was attributable to the part year depreciation of "prints" in that year, is addressed following our discussion of depreciation relative to the film.↩
15. For purposes of this computation, net income is income derived from the film less the expenses of distribution. See Fife v. Commissioner,82 T.C. 1 (1984); Wildman v. Commissioner,78 T.C. 943, 950↩ at n. 8 (1982).
16. See also Tarricone v. Commissioner,T.C. Memo. 1983-674↩.
17. See Beck v. Commissioner,T.C. Memo. 1984-279↩.
18. Robert T. Schwer, an accountant for the partnership, testified herein that "[i]t was my understanding that some $6,000 was deposited into an account with [UA] in the name of Shhh [the partnership] as proceeds from distribution in 1976." Since Schwer's testimony concerning the nature of this account was confusing, however, we place no reliance on it in deciding the present issue.↩
19. Both parties concede the applicability of sec. 48(k)↩ to the instant issue.
20. Petitioners offered into evidence herein a document identified as production notes prepared by UA relative to the film. Over respondent's objection, we admitted this exhibit for the limited purpose of showing the advertising and promotional efforts made by UA on behalf of the film.As noted by respondent on brief, such exhibit states that the short film "Canoe Trip," "was made especially for the feature by producer Gable and writer-director Price," and "was filmed on location in Canada and in Carteret, New Jersey, where the 'bridge' or connecting link of 'Shhh!' was made." In light of our disposition of this matter on the basis of petitioners' failure to meet their burden of proof, however, it will be unnecessary to consider respondent's contention that, notwithstanding his objections at trial, petitioners' exhibit should now be considered for the truth of the foregoing statements.↩
21. Applying the rule of sec. 1.48-8(g)(1), Income Tax Regs., in a recent Memorandum Opinion of this Court, Crum v. Commissioner,T.C. Memo. 1984-328, we were similarly confronted with a record which failed to disclose the amount of the seller's qualified United States production costs. Unlike the instant case, however, it was unnecessary to determine whether that amount was less than the at risk portion of the fixed purchase price for the film in Crum, since respondent had therein conceded the taxpayer's entitlement to an investment credit based upon the latter amount. We note also that where qualified United States production costs cannot otherwise be established, sec. 1.48-8(g)(2)(ii), Income Tax Regs.↩, establishes a presumption that such costs equal the amount of the fixed purchase price for the film, but only where the purchaser can show that the film was produced entirely in the United States. Petitioners have not sought to avail themselves of this presumption herein. Even if they had, however, they would be required to prove that the film was produced entirely in the United States, which they have failed to do.
22. While the Memorandum indicated that the purchase price of $125,000 would consist of $12,500 in cash, $12,500 by a recourse note and $100,000 by a nonrecourse note, and the purchase agreement actually provided for the same purchase price to consist of $10,000 in eash, $15,000 either in each or by a recourse note, and $100,000 by a nonrecourse note, we do not believe that this disparity indicates that any meaningful negotiations transpired.↩